(December 16, 2014)

█ TATIANA CHEEKS, Respondent, v CITY OF NEW YORK, Appellant. [998 NYS2d 847]—

Judgment, Supreme Court, Bronx County (John A. Barone, J.), entered on or about December 22, 2011, upon a jury verdict, awarding plaintiff damages on her causes of action for false arrest and malicious prosecution, reversed, on the law, the facts and in the exercise of discretion, without costs, and the matter remanded for a new trial.

Friedman, J.P., and Sweeny, J., concur in a separate memorandum by Friedman, J.P., as follows: Plaintiff Tatiana Cheeks was the sole custodian and caregiver of her daughter Cha-Nell, who was born in healthy condition on February 16, 1998. Early in the morning of March 27, 1998, plaintiff found 5½-week-old Cha-Nell unresponsive and not breathing; the infant was taken to the hospital and pronounced dead on arrival. The cause of the little girl's death was not immediately clear—although the emergency room doctor remarked at the time that the "child presents as malnourished"—and an autopsy was performed. Two months later, on May 26, 1998, the New York City medical examiner's office issued its determination—based on extensive physical and chemical observation, measurement and analysis recorded in the 48-page autopsy report—that the infant had, indeed, died of malnutrition, and that the malnutrition was not due to any detectable defect in her digestive system.[1] This conclusion has never been questioned, not even by plaintiff or the medical expert who testified on her behalf in this action.[2]

Based on the medical examiner's determinations, Detective Donald Faust of the New York City Police Department reopened the investigation of Cha-Nell's death, took plaintiff into custody and arrested her on suspicion of having caused her daughter's death through neglect of the infant's feeding. On May 29, 1998, plaintiff was arraigned on charges of criminally negligent homicide (Penal Law § 125.10) and reckless manslaughter (Penal Law § 125.15 [1]).[3] On July 1, 1998, however, the charges against plaintiff were dropped. The reason for the district attorney's voluntary dismissal of the case does not appear in the record. Plaintiff subsequently commenced this action against the City of New York for false arrest and malicious prosecution.

---

**1.** In support of the conclusion that the infant died of malnutrition, the first page of the report states that the infant's "weight at autopsy [was] below birth weight and well below 5th percentile for [her] age"; that the infant had "scant body fat" and her "organ weights [were] below expected for [her] age"; and that the body evidenced "fat and other organ atrophy histologically."

**2.** Plaintiff's expert testified under cross-examination as follows:

"Q. Ultimately, . . . the medical examiner . . . determined conclusively that the baby died of malnutrition; correct?

"A. Correct.

"Q. And you are not disputing that opinion; correct?

"A. No, I am not disputing that."

**3.** Upon arresting plaintiff, Detective Faust had charged her with depraved indifference second-degree murder (Penal Law § 125.25 [2]). The district attorney's office omitted that charge from the arraignment. As the detective testified, it is police practice to charge a suspect upon arrest with the most serious offense deemed potentially applicable, after which the prosecutors often reduce the charge to a lesser offense (or offenses) upon arraignment, as occurred here.

As more fully discussed later in this opinion, the City's liability in this matter hinges on whether Detective Faust, when he arrested plaintiff without a warrant, had probable cause to believe that she had caused her daughter's fatal malnutrition through neglect. That is to say, the ultimate issue in the case is not whether plaintiff actually neglected her daughter but whether the detective reasonably concluded, based on the evidence available to him at the time of the arrest, that she probably had done so. Thus, it is not legally relevant that a factfinder, or a reviewing court, might be persuaded by a trial record created 13 years after the arrest that plaintiff was not, in fact, responsible for the infant's death. Rather, to prevail, plaintiff was required to prove that it had not been reasonable for the detective to infer, from the information available to him when the arrest was made in 1998, that the infant's death probably had been caused by her mother's neglect.

This tort action went to trial after the City's motion for summary judgment was denied as untimely under applicable procedural rules.[4] Plaintiff, who had breast-fed her daughter, did not deny that she had been the baby's sole custodian and, to reiterate, her medical expert did not take issue with the medical examiner's conclusion that the baby had died of malnutrition and that the malnutrition had not been caused by any observed physical or chemical defect. Rather, the expert offered the theory that the baby could have starved to death in spite of diligent feeding due to the "failure to thrive" syndrome, in which, unbeknownst to the nursing mother, her ostensibly healthy baby fails, for undetermined reasons, to ingest sufficient breast milk to sustain life.

Detective Faust, for his part, testified that he had arrested plaintiff in reliance on the medical examiner's conclusions that the child had died of malnutrition and that there was no medical cause for the malnutrition. From those findings of the medical examiner (which, again, have never been disputed), the detective inferred that it was probable that the child's malnutrition had resulted from the neglect of her feeding by her caregiver (plaintiff), and that such neglect constituted a crime. In this regard, Detective Faust—who said that seeing Cha-Nell's body had made an "indelible" impression on him and had "impacted [him] in th[e] same manner" as "seeing the World Trade Center fall"—testified as follows:

"Q. . . . Is there any indication [in the final diagnosis set

---

4. While the dissent sees fit to take the City to task for having filed an untimely summary judgment motion, I observe that the City made that motion during one of the many periods during which the action was marked off-calendar.

forth on the first page of the autopsy report] that the medical examiner found a digestive problem that led to malnutrition listed on his final diagnosis?

"A. No.

"Q. Is there anything from the medical examiner indicating that there was something biologically or medically wrong with the baby leading to the conclusion of malnutrition?

"A. No.

"Q. Based upon the absence of those terms, in conjunction with your conversation with the medical examiner, did you reach an understanding as to whether the malnutrition was a result of a lack of proper feeding or whether it was due to something wrong with the baby in some way, shape or form?

"A. I found that there was nothing wrong with the baby and it was due to a lack of feeding.

"Q. Now, when you say you found, that is based on what?

"A. Based on the medical examiner's determination that there was nothing wrong with the baby. The baby was born perfectly healthy and yet the baby died of malnutrition.

"Q. So, you did not make your own medical conclusion about the condition of the baby?

"A. No.

"Q. You didn't make your own medical conclusion at the time you observed the baby at the hospital; correct?

"A. No.

"Q. You did not make your own medical conclusions at the time you were present at the autopsy; correct?

"A. No. . . .

"Q. Were medical conclusions presented to you at some point in time?

"A. Yes.

"Q. And when were they presented to you?

"A. They were presented to me on May 26th, 1998.

"Q. And based upon those medical conclusions what did you do?

"A. Based upon those medical conclusions I reopened the case, changed the qualification from investigate D.O.A. to possible homicide, investigate homicide, and continued the investigation."[5]

---

**5.** Earlier in the proceedings, Detective Faust had testified to similar effect as follows: "Q. And in what way did [plaintiff] improperly feed the infant?"

Detective Faust concluded his testimony by stating that, once he had reopened the case as a homicide investigation, he identified plaintiff as the person responsible for Cha-Nell's death because plaintiff "had total custody and control of the child and was responsible for the feeding and nurturing of the child." That point is undisputed.

Plaintiff presented no evidence to show that Detective Faust, when he decided to make the arrest in 1998, had any reason to be aware of the "failure to thrive" theory, which plaintiff's expert propounded at trial in 2011. Plaintiff's case against the City boiled down to the claim that, after Detective Faust received the official autopsy report concluding that the child had died of malnutrition for which the medical examiner was "unable to find a medical explanation" (as written in a note, dated May 7, 1998, included in the report), the detective—although a layman in medical matters—should have intuited the "failure to thrive" theory on his own.[6] Based on that theory, plaintiff contended, Detective Faust should have credited plaintiff's uncorroborated self-exculpatory claims (which she repeated in her trial testimony) that she had diligently fed the

---

"A. She fed the infant not enough to keep the infant alive and caused the infant to die of malnutrition, because the infant was born perfectly healthy and it cannot feed itself, it cannot say I don't want food, it can't commit suicide, so she was charged . . . ." Similarly, at another point in the trial, Detective Faust gave the following testimony:

"Q. . . . Based upon the medical examiner's autopsy, was there anything biologically wrong with this child before it died?

"A. No.

"Q. Was there any disease that it suffered from?

"A. No.

"Q. Was there any reason that it should not have been able to thrive had it been provided enough food in its stomach?

"A. No."

6. Justice Acosta, in his dissent, faults the medical examiner for writing in the above-quoted note of May 7, 1998, that he inferred that the case was likely "a homicide" because, "with most of the test results [then] in [he was] unable to find a medical explanation" for the child's malnutrition. This inference was entirely reasonable, but even if the medical examiner's report could be professionally criticized in some way, plaintiff's claims against the City are *not* based on the conduct of the medical examiner; indeed, on this record, no claim against the City based on the medical examiner's conduct would lie (*see Lauer v City of New York*, 95 NY2d 95, 100-102 [2000]). Rather, plaintiff's claims are based entirely on the determinations to arrest and prosecute her, which were made by police and prosecutorial personnel who were not medical professionals and, therefore, had no choice but to rely on the medical examiner's findings about the medical aspects of the case in doing their jobs. In this regard, Detective Faust testified that "[t]he determination of cause of death is solely the responsibility of the medical examiner"—in other words, that, in conducting the investigation, he was obligated to accept the medical examiner's findings.

baby and, until the morning she found her without breath or pulse, had not had any idea that her daughter was slowly starving to death.[7]

The jury returned a verdict for plaintiff, finding that there had not been probable cause for the arrest in spite of the detective's reliance on the medical examiner's undisputed conclusion that the infant had died of malnutrition. For reasons more fully discussed later in this writing, Justice Sweeny and I believe that this verdict is legally insupportable on the trial record, even if one excludes from consideration the medical examiner's conclusion, not only that the baby had died of malnutrition, but that the "manner of death" had been "parental neglect," a statement that was redacted erroneously, but without objection by the City, from the autopsy report as received into evidence. Accordingly, Justice Sweeny and I believe that, on the instant appeal by the City, we should reverse the judgment for plaintiff, grant the City's motion for judgment notwithstanding the verdict and dismiss the complaint, and we disagree insofar as the full bench fails to do so. However, since a majority of the panel is not inclined to dismiss the complaint, Justice Sweeny and I concur with Justice Kapnick insofar as we are reversing the judgment and granting the City a new trial based on the court's error in failing to admit the unredacted autopsy report into evidence to cure the prejudice accruing to the City from an improper line of inquiry pursued by plaintiff's counsel, as more fully discussed toward the end of this writing.

Before turning to the legal analysis of the issues raised by this appeal, I believe it necessary to point out a number of mischaracterizations of the record and of the law in the dissenting opinion.

1. In its very first paragraph, the dissent asserts—as if Detective Faust had no basis for concluding otherwise at the time of plaintiff's arrest—that the infant died "despite the best efforts of her attentive mother to nourish and care for her." In fact, the only support for characterizing plaintiff as an "attentive mother," either at the time of the relevant events or at trial, were plaintiff's own uncorroborated self-exculpatory claims. Although plaintiff's medical expert purported to opine that plaintiff actually had diligently fed the baby, that opinion was

---

7. The dissent may deny taking the position that the detective should have intuited the failure to thrive theory, but that was assuredly plaintiff's position at trial and continues to be her position on appeal. The findings of malnutrition and of no evidence of an internal defect are both undisputed. Accordingly, to have any claim against the City based on her arrest, plaintiff had to posit some cause of the infant's malnutrition, other than her own negligence as sole caregiver, of which the detective should have been aware. On this record, she failed to do that.

legally irrelevant because (1) the expert's opinion, unlike the medical examiner's autopsy report, was unavailable to Detective Faust when he arrested plaintiff in 1998 and thus cast no light on the presence or absence of probable cause for the arrest, and (2) the opinion was based entirely on the witness's nonexpert determination to credit plaintiff's pretrial self-exculpatory testimony and was therefore inadmissible as expert testimony (*see People v Eberle*, 265 AD2d 881, 882 [4th Dept 1999] [expert testimony was not admissible where it "was not based on professional or medical knowledge but rather was based on inferences and conclusions drawn from various statements presented to (the expert)"]).[8]

2. The dissent baselessly attributes the infant's death to her having been "neglected and ignored by" a murky entity denominated "the local medical establishment." The record shows that plaintiff knew that, until she obtained a Medicaid card for the baby (which she never did), she could take the baby to an emergency room for any urgently needed attention. Apart from taking the baby to a clinic one time, a week after she was born (from which plaintiff was turned away, after a quick examination, for lack of a Medicaid card for the baby or $25), plaintiff never sought any medical attention for the baby until she died. Contrary to Justice Acosta's accusation that I discuss these matters "to insinuate that [plaintiff] was responsible for her child's death," I refer to the history of plaintiff's seeking medical attention for the infant only to respond to the dissent's baseless attempt to place blame for Cha-Nell's death on "the local medical establishment." In a case concerning an arrest for the death-by-starvation of an anatomically and physiologically normal infant, this effort to shift attention to the alleged deficiencies of the City's public health institutions is a red herring. As Detective Faust testified, he arrested plaintiff "[b]ecause she did not adequately feed the baby and it cause[d] the baby to die."

3. The dissent attempts to create the appearance of a material issue of fact by taking out of context Detective Faust's state-

---

**8.** There is no dispute that plaintiff's expert was competent to give testimony positing an alternative explanation for the infant's malnutrition that did not involve fault on plaintiff's part. The expert's competence to offer such an alternative explanation for the child's death, however, did not render him competent to address the factual issue of which of the two explanations was correct, given that he failed to identify any medical evidence supporting one theory over the other. As the expert himself admitted, the presence of food and stool in the child's digestive tract at death did not show whether she had been adequately fed for the preceding 5 1/2 weeks. Again, plaintiff's credibility as a witness was not a proper issue for expert testimony.

ment, at the tail end of his testimony, that "[b]y that one singular fact of the child dying from malnutrition, no, I would not make an arrest in that case" (which I will refer to as the "singular fact" statement). Contrary to the dissent's implication, the "singular fact" statement does not show that disputed information from outside the autopsy report (such as plaintiff's efforts to seek medical attention for Cha-Nell or what plaintiff's grandmother told the police) was essential to the determination to arrest plaintiff. Rather, when the "singular fact" statement is read in the context of the three pages of the detective's testimony that immediately follow it (after which he was excused), it is plain that the detective meant that it was essential to his determination to make the arrest that the medical examiner found *both* that the death resulted from malnutrition *and* that the malnutrition did not result from any internal medical defect, and, moreover, that his investigation determined that plaintiff, by her own admission, had been the sole caregiver.[9] Contrary to the dissent's inaccurate assertions, neither the subject of plaintiff's grandmother's statements to the police, nor the subject of plaintiff's efforts to seek medical care for the baby, was raised again in the detective's brief remaining testimony after he made the "singular fact" statement. Further, as the trial record makes clear, those subjects were relevant only to whether the detective had grounds for believing that plaintiff had acted with depraved indifference or recklessness to support a charge for murder (Penal Law § 125.25 [2]) or manslaughter (Penal Law § 125.15 [1]).[10] Since, as a matter of law, the autopsy report and plaintiff's admitted status as sole caregiver furnished probable cause for an arrest for criminally negligent homicide alone—a felony of which neither depraved indifference nor recklessness is an element (*see* Penal Law

---

9. I have quoted the relevant testimony from the three pages of the trial record following the "singular fact" statement earlier in this writing, at the end of the paragraph above that begins, "Detective Faust, for his part." A mere perusal of this testimony refutes Justice Acosta's assertions and the inferences he seeks to draw.

10. While Detective Faust never testified that the grandmother's statements and plaintiff's efforts to seek medical attention were necessary bases for suspecting plaintiff of criminal *negligence*, he testified that those matters did constitute the basis for suspecting her of *recklessness*:

"Q. . . . I'm asking you factually, can you tell us factually what [plaintiff] did in your mind factually that you consider reckless conduct?

"A. She failed to listen to other people's opinion who had nurtured and cared for children, who also had nurtured and cared for her, which was her grandmother. Her grandmother, in my statements it shows that, told her that the child was not—the child was too skinny, the child wasn't healthy, the child looked like it wasn't eating enough and she should take the child to the hospital. She refused. That's reckless."

§ 125.10; Penal Law § 15.05 [4])—any controversy concerning the grandmother's statements or plaintiff's efforts to seek medical attention did not warrant submitting the case to the jury. Further, while the record offers no support for the dissent's position that such matters were subjectively but mistakenly thought by the detective to have been essential to the determination to arrest plaintiff for criminally negligent homicide, the detective's subjective understanding could not change the fact that, as a matter of law, the medical examiner's opinion and plaintiff's admitted status as sole caregiver objectively provided probable cause for an arrest on that charge.[11]

4. The dissent asserts that plaintiff was the victim of a "rush to judgment" by the police department, which had only "a flimsy record" on which to base the decision to arrest her. In fact, there was no "rush to judgment." Plaintiff was not arrested until two months after the death of her daughter, when the medical examiner's office issued the 48-page official autopsy report finding that the baby had died of malnutrition that was unrelated to any physical defect—a conclusion not challenged even by plaintiff's expert—but that was, in the medical examiner's opinion, probably due to parental neglect. *That*, in addition to other evidence discussed below, is the "flimsy record" to which the dissent refers.

5. There is absolutely no support in the record for the dissent's assertion that the charges against plaintiff were dropped because they were found to be "bogus." Further, the only medical opinion in the record attributing the death to "failure to thrive" syndrome is that of plaintiff's paid expert, and that opinion was offered in the course of this action, years after the relevant events. To reiterate, the record does not contain a shred of evidence tending to show that, at the time of the arrest, Detective Faust had any reason even to be aware of the "failure to thrive" theory, much less to accept it as the probable explanation of the baby's death.

6. The dissent accuses Detective Faust of "ignor[ing] all the signs that pointed to a non-criminal cause of the infant's death" and of "blind[ly] following . . . the autopsy report notwithstand-

---

**11.** Notably, in the instrument the detective signed upon which plaintiff was arraigned, dated May 28, 1998, he referred to only two bases for the charges against her: (1) the medical examiner's opinion, after examining the infant's body, that she had died of malnutrition; and (2) plaintiff's "own statements that [she] is the mother of [the infant] and that [she] breastfed [sic] [the infant] and was the sole source of nourishment for [the infant]." The instrument makes no reference either to plaintiff's grandmother's statements or to any deficiencies in plaintiff's efforts to obtain medical attention for the baby.

ing the other evidence" supposedly tending to exonerate plaintiff. Upon analysis, these "signs" and "other evidence" amount to nothing more than plaintiff's own self-exculpatory statements, the medical examiner's initial visual impression that the deceased baby "appeared to be well fed," and the presence of some food in the baby's stomach and partially digested food and stool in the intestines upon her death. I am mystified by the dissent's reasoning that the medical examiner's initial visual impression of the body (which, as noted, the emergency room physician did not share) was more worthy of reliance than the medical examiner's ultimate finding, after extensive scientific analysis, that the baby had died of malnutrition—a finding disputed by no one, not even by the dissent.[12] As to the presence of milk curds in the stomach, as previously noted, that showed only that the infant had been fed shortly before she died and revealed nothing about whether she had been adequately fed over the 5½ weeks she had been alive—as plaintiff's medical expert conceded at trial.[13] Similarly, the presence of partially digested food and stool in the intestines did not show that infant had been adequately fed for 5½ weeks.[14] Finally, in view of the established fact that the child died of malnutrition unrelated to

---

**12.** While the baby's body initially appeared "well fed" to the medical examiner, as previously noted, the emergency room physician, Dr. Svetlana Bikvan, formed a different impression. As set forth in the hospital record (and acknowledged by plaintiff's expert at trial), Dr. Bikvan, upon viewing the baby's body, observed that "[the] child present[ed] as *malnourished*" (emphasis added), although she saw "no bruises" (which is irrelevant to this case, since plaintiff was never charged with having beaten the baby). Inexplicably, the dissent not only ignores Dr. Bikvan's observation that the child appeared to have been "malnourished" but misleadingly asserts that Detective Faust testified that "*two* medical professionals [presumably meaning Dr. Bikvan and the medical examiner] who viewed the child's body saw no apparent signs of abuse or neglect . . . and concluded that she appeared to be well fed" (emphasis added). In fact, the detective testified only that the *medical examiner*, not Dr. Bikvan, initially told him that the child "appeared" to have been "well fed"—an opinion that was abandoned, based on all of the available medical evidence, in the autopsy report issued two months later, which constituted the primary basis for plaintiff's arrest.

**13.** Plaintiff's expert testified under cross-examination as follows:

"Q. And to be clear, Doctor, although the baby had food in its stomach at the time of its death, it's not the feeding before its death that matters but what it had been fed from the time of birth up until the time of death that caused the malnutrition; correct?

"A. It's the amount of milk, yes.

"Q. So, the amount of milk from the date of birth, February 16th, 1998, until the date of its death, March 27th, 1998, that is the timeframe that matters; correct?

"A. Yes."

**14.** I am astonished by the dissent's statement that the autopsy report "indicat[es] that the child *was being fed*" (emphasis added), as if the report of the postmortem contents of Cha-Nell's digestive tract showed that she had

any detectable medical defect, it was reasonable, as a matter of law, for Detective Faust to discredit plaintiff's uncorroborated attempts at self-exculpation.

7. The dissent highlights various portions of the autopsy report—quoting, for example, the paragraphs of the final summary report describing the digestive and musculoskeletal systems and recounting the finding of no drugs or alcohol in the blood—as if these somehow tend to negate the natural inference that malnutrition in a helpless infant, absent any evidence of an internal defect, likely resulted from neglect by the caregiver.[15] Similarly, the dissent makes the risible assertion—one not even made by plaintiff's expert witness—that "a careful reading of the report should have alerted the detective [who was not a medical professional] that the medical examiner's redacted opinion [that the malnutrition resulted from neglect] was not even supported by the contents of the report." What the dissent overlooks is the fact that all of the medical evidence in the autopsy report establishing that the infant died of malnutrition (as is undisputed), combined with the undisputed lack of evidence of any internal defect, constituted circumstantial evidence of neglect by the caregiver.[16] Thus, the dissent's assertion that there was a "lack of evidence indicating parental neglect" is simply inaccurate. Stated otherwise, the finding of malnutrition in an infant of Cha-Nell's age (completely undisputed), in the absence of evidence of an internal defect in the digestive tract (again, completely undisputed), sufficed, as a matter of law, to create probable cause to believe that plaintiff had neglected her daughter's feeding, even if one excludes from consideration the medical examiner's further conclusion that the malnutrition had resulted from "parental neglect." Again,

---

been diligently fed throughout her short life, even though she ultimately had somehow starved to death.

**15.** Particularly mystifying, in a case where the issue is whether there was probable cause to believe that plaintiff had neglected the *feeding* of her daughter, is the dissent's quotation of the report's description of the infant's "clavicles, sternum, ribs, vertebral column, and pelvis" as "unremarkable" and having "no fractures." Equally mystifying is the dissent's view that an autopsy report expressly attributing the death of an otherwise normal infant to "malnutrition" contains "no evidence of any form of neglect or abuse." The dissent does not come to grips with the fact that neglect of an infant's feeding is a form of neglect.

**16.** This is plainly what the author of the autopsy report, Acting Deputy Chief Medical Examiner Stephen de Roux, M.D., meant in writing in his aforementioned note of May 7, 1998, that the case was "heading in the direction of a homicide" because, "with most of the test results now in, I am unable to find a medical explanation" for the infant's malnutrition. Inexplicably, the dissent takes exception to this logical statement by a professional medical investigator.

the contents of the infant's stomach and intestines showed only that she had been fed at some points before her death, not that she had been adequately fed for the preceding 5½ weeks. In sum, contrary to the dissent's baseless assertion, nothing in the autopsy report corroborated plaintiff's claims that she had been "doing her best to feed her infant daughter," and—in light of the report's completely undisputed conclusion that the infant died of malnutrition—it was reasonable, as matter of law, for the detective to decline to take at face value plaintiff's understandable attempts to exonerate herself.[17]

8. The dissent asserts that "there was no indication that plaintiff had either intentionally, recklessly or negligently starved the infant."[18] Since the findings of malnutrition and lack of an internal digestive defect are entirely undisputed (even by the dissent), this statement inaccurately implies that the medical evidence somehow pointed to the "failure to thrive" theory posited by plaintiff's expert at trial 13 years after the fact. Again, the medical evidence established only that the infant died of malnutrition not connected to any observed internal defect—from which negligence by the caregiver could reasonably be inferred—and, for the reasons previously discussed, nothing in the medical evidence suggested the "failure to thrive" theory that was the sole basis of plaintiff's claim.[19] In any event, to reiterate, plaintiff did not even attempt to show that Detective Faust had any reason to be aware of the "failure to thrive" theory at the time of the arrest.

9. Because the issue in the case was the reasonableness of Detective Faust's inference from the information available to him in 1998 that the infant's death probably had resulted from plaintiff's neglect—not whether the jury believed, based on the trial record created in 2011, that plaintiff actually had neglected

---

**17.** The dissent's assertion that "the contents of the [medical examiner's] report along with the other evidence did not provide probable cause" for plaintiff's arrest, as well as the dissent's denial of the detective's right to discredit plaintiff's account in the face of the autopsy report, amount to an attempt to wish away both logic and the evidence.

**18.** The dissent apparently throws in the word "intentionally" for inflammatory effect, since it has no relevance to the case. Plaintiff was never charged with having intentionally caused her daughter's death, and Detective Faust specifically testified that he did not believe that plaintiff had intended to starve the baby.

**19.** After all, as previously noted, given that the record establishes, without dispute, that the child died of malnutrition unrelated to any detectable internal digestive defect, plaintiff could not maintain this action unless she posited some cause of the malnutrition other than her own negligence as sole caregiver. Needless to say, the 5½-week-old baby could not feed herself.

her daughter—the following attempted defense by the dissent of the jury's verdict is inapt:

"The jury reasonably could have found that, at the time of arrest, there was no basis for a prudent person to believe that an offense had been committed. That is, that the mother did not act recklessly or negligently in feeding the child and/or not realizing that the child was malnourished, or did not in fact commit any offense whatsoever."

This passage is a legal sleight of hand. Through the use of the equivocal phrase "That is" at the start of the second sentence, the dissent seeks to equate a finding that "there was no basis for a prudent person to believe that an offense had been committed" with a finding that "the mother did not act recklessly or negligently in feeding the child and/or not realizing that the child was malnourished, or did not in fact commit any offense whatsoever." Again, whether "there was [a] basis for a prudent person to believe that an offense had been committed" (the question presented in this action) is a question entirely different from the question of whether plaintiff "act[ed] recklessly or negligently in feeding the child and/or not realizing that the child was malnourished, or did not in fact commit any offense whatsoever" (a question that is emphatically *not* presented in this action). The first question—the relevant one—is conclusively answered in the City's favor by the official autopsy report, regardless of any trial evidence from which the jury could have answered the second question—the irrelevant one—in plaintiff's favor.

Turning to the legal analysis of this appeal, the error made by my three colleagues who decline to dismiss the complaint, based on the evidence in the trial record, is the same one that was recently made by the majority of the panel of this Court that affirmed a similar judgment for a plaintiff after trial, only to be summarily reversed on appeal to the Court of Appeals, in *Lewis v Caputo* (95 AD3d 262 [1st Dept 2012], *revd* 20 NY3d 906 [2012]). As the Court of Appeals stated in *Lewis*: "While different inferences as to plaintiff's guilt or innocence of the underlying crime are possible, only one reasonable inference could be drawn from the facts regarding probable cause. Therefore, the issue was not one properly presented to the jury for determination" (20 NY3d at 907). Those words are equally applicable to this case.[20]

To reiterate, the underlying question of plaintiff's guilt or in-

---

**20.** *See also Figueroa v Mazza,* — F Supp 3d —, 2014 WL 4853408, *1, 2014 US Dist LEXIS 139212, *4 (ED NY, Sept. 30, 2014, Weinstein, J., No. 11-CV-3160) (setting aside a jury verdict for the plaintiff on his claims for

nocence of the crime for which she was initially charged is of no moment in this civil action against the City for false arrest and malicious prosecution. Further, assuming that the police were presented, at the time of the arrest, with conflicting evidence concerning how the infant's death came about (which is the sole basis for the position of three members of this panel that the complaint should not be dismissed), any such "conflicting evidence . . . [was] relevant to the issue of whether guilt beyond a reasonable doubt could have been proven at a criminal trial, *not* to the initial determination of the existence of probable cause" (*Agront v City of New York*, 294 AD2d 189, 190 [1st Dept 2002] [emphasis added])—a principle recently reaffirmed by a panel of this Court that included the author of the dissent (*see Medina v City of New York*, 102 AD3d 101, 107 [1st Dept 2012] [citing *Agront* in support of summary judgment dismissing claims for false arrest and malicious prosecution]; *see also Williams v City of New York*, 114 AD3d 852, 854 [2d Dept 2014] [citing *Lewis, Medina* and *Agront* in support of summary judgment dismissing claims for false imprisonment and malicious prosecution]). As the Court of Appeals has observed, any "discrepancies" in the authorities' case against an arrested person "may impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime" (*Gisondi v Town of Harrison*, 72 NY2d 280, 285 [1988]).

"Probable cause exists if the facts and circumstances known to the arresting officer warrant a prudent person in believing that the offense has been committed" (*People v Baker*, 20 NY3d 354, 359 [2013] [internal quotation marks and brackets omitted]; *see also People v Bigelow*, 66 NY2d 417, 423 [1985] [probable cause requires "merely information sufficient to support a reasonable belief that an offense has been . . . committed"]). "The evidence necessary to establish probable cause to justify an arrest need not be sufficient to warrant a conviction" (*Veras v Truth Verification Corp.*, 87 AD2d 381, 385 [1st Dept 1982], *affd for reasons stated* 57 NY2d 947 [1982]). And, as previously discussed, conflicting evidence as to guilt or innocence, and discrepancies in the case being built against the arrested person, while relevant to the prosecution's ability to prove guilt beyond a reasonable doubt at trial, are not relevant to the determina-

---

false arrest, inter alia, and granting the defendant police officers judgment as a matter of law, notwithstanding that the jury might have discredited the defendants, and although the "[c]harges against plaintiff were eventually dropped").

tion of whether there was probable cause for an arrest (*see Gisondi,* 72 NY2d at 285; *Williams,* 114 AD3d at 854; *Medina,* 102 AD3d at 107; *Agront,* 294 AD2d at 190). Further, "when the facts and circumstances are undisputed, when only one inference [concerning probable cause] can reasonably be drawn therefrom and when there is no problem as to credibility . . . , the issue as to whether they amount to probable cause is a question of law" (*People v Oden,* 36 NY2d 382, 384 [1975]). Since there is no dispute about either (1) plaintiff's status as the infant's sole custodian, (2) the contents of the autopsy report, or (3) the detective's reliance upon the autopsy report in making the arrest and initiating the subsequently aborted prosecution, probable cause for plaintiff's arrest and prosecution existed as a matter of law. It follows that this case should not have been submitted to the jury and that the City's motion for judgment notwithstanding the verdict should have been granted.

As previously discussed, the various factual matters discussed by the dissent—which matters the dissent generously characterizes as "other evidence that could have led a reasonably prudent person to conclude that plaintiff had committed no offenses even though the cause of death was malnutrition"—simply cannot overcome the probable cause for the arrest established by the autopsy report. While the dissent (ignoring, as previously noted, the emergency room doctor's observation that the infant's body "present[ed] as malnourished") points to the medical examiner's initial impression that she "appeared to be well fed," plaintiff was not arrested on the basis of these first impressions but on the basis of the full autopsy report that became available two months later, which concluded, based on exhaustive measurement and analysis, that the cause of death was, in fact, malnutrition—as the emergency room doctor had immediately suspected. On the day the autopsy report was released, the medical examiner who authored it spoke to Detective Faust and, according to notes kept by an assistant district attorney who was also present for the interview, summarized the report's findings as follows: "[The] child was malnourished, had no baby fat, and the internal organs were beginning to lose muscle because of lack of nourishment. The baby weighed 2.8 kg in hospital [at birth] and at 5 weeks weighed only 2.6 kg."

Once the medical examiner's office issued its findings, based on the completed autopsy, that the cause of death was malnutrition, and that no defect in the child's digestive system had been detected, that determination in itself plainly constituted circumstantial evidence of neglect and rendered obsolete the

medical examiner's initial visual impression that the body did not show external "signs of neglect or abuse."[21] Further, in the face of the official autopsy report identifying malnutrition as the cause of death, the detective was not required to credit the statements plaintiff had made to him (before the autopsy report had been issued) in an attempt to exonerate herself from responsibility for her daughter's death. "An accused's exculpatory statement does not, of course, negate the existence of probable cause" (*Coleman v City of New York*, 182 AD2d 200, 205 n [1st Dept 1992]; *see also e.g. Baker v City of New York*, 44 AD3d 977, 980 [2d Dept 2007], *lv denied* 10 NY3d 704 [2008]; *Drayton v City of New York*, 292 AD2d 182, 183 [1st Dept 2002], *lv denied* 98 NY2d 604 [2002]).

Neither does the remaining purportedly exculpatory evidence recounted in the dissent negate the probable cause for plaintiff's arrest that was established as a matter of law by the autopsy report. The presence, at the time of death, of food in the child's stomach, and of partially digested food and stool in the intestines, showed only that plaintiff had sometimes fed the infant before she died, and revealed nothing about whether she had been adequately fed over the 5½ weeks she had been alive.[22] Any issue of fact as to the accusations plaintiff's grandmother made to the detective about plaintiff (as summarized in the following footnote) pales into insignificance in the face of the autopsy report, which was sufficient, standing alone, to provide probable cause for the arrest, given the undisputed fact that plaintiff was her daughter's sole custodian.[23] Finally, the dissent blatantly mischaracterizes the record in asserting that the jury

**21.** Certainly, the medical examiner's uncontradicted conclusion that the infant died of malnutrition—the correctness of which neither plaintiff nor any justice on this bench questions, there being no basis in the record to support such questioning—establishes that the initial visual impression that the infant's body "appeared to be well fed" was simply mistaken and entitled to no weight.

**22.** Indeed, the presence of food and stool in the stomach and intestines tends to undercut plaintiff's "failure to thrive" theory of her daughter's death. Under that theory, as explained by plaintiff's expert at trial, a breastfeeding baby fails to take in sufficient breast milk to sustain itself. Thus, the contents of the infant's digestive tract at death tend to show that she was capable of ingesting milk from her mother's breast when given an opportunity to do so.

**23.** The notes of the grandmother's interview on the day the autopsy report was released reflect the following statements to Detective Faust, another detective and an assistant district attorney: "Witness saw baby was very small. She told [plaintiff] to drink more milk and nurse baby longer. Wit[ness] saw [plaintiff] try to pump milk from breast for long time obtaining very little milk and leaving the pumped milk around the house i.e. not giving it to baby. Wit[ness] stated she minded the baby for very short periods of time (an hour

could find "malice" from the detective's supposed "disregard of evidence that the child was being fed and was not otherwise neglected or abused." The detective did not "disregard" the evidence to which the dissent refers, namely, the first impressions formed upon the initial examination of the infant's body, which were not the basis for the arrest. In fact, when those first impressions were the best evidence available to him, the detective did not think he had reason to believe that a crime had been committed. Those first impressions became academic, however, when the full autopsy report was produced two months later, setting forth the conclusion, after full consideration of all the forensic evidence, that the child had died of malnutrition.

While it is true that "the issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts *or the proper inferences to be drawn from such facts*" (*Parkin v Cornell Univ.*, 78 NY2d 523, 529 [1991] [emphasis added]), the dissent distorts the italicized phrase by suggesting throughout that the relevant "inferences" in this inquiry concern the underlying question of the arrested person's guilt or innocence. On the contrary, the "inferences" at issue in an action for false arrest concern whether the arresting officer had a reasonable (even if contestable) basis for concluding that the arrested person probably did commit an offense—in other words, an inference about the reasonableness of the inference the arresting officer drew about the arrested person's guilt or innocence. That the facts might give rise to conflicting inferences about an arrested person's guilt or innocence does not necessarily mean—and, on the record in this case, emphatically does *not* mean—that conflicting inferences could reasonably be drawn about the presence or absence of probable cause for the arrest. Here, the detective who arrested plaintiff did so on the basis of the best evidence that was available to him—the official autopsy report concluding that the 5½-week-old infant died of malnutrition and that the malnutrition had not been caused by any inborn defect. In view of this evidence, the only inference that could reasonably be drawn was that the detective had probable cause to believe that plaintiff had neglected her child.

The dissent seems to believe that, even after the detective

or so) and [plaintiff] did not leave food for the baby." Plaintiff does not challenge the veracity of this contemporaneous account—by the assistant district attorney, not Detective Faust—of what the grandmother told the investigators. Notwithstanding the dissent's best efforts to "spin" the record in plaintiff's favor, this uncontroverted account of what the grandmother told the arresting detective provides no support to plaintiff's claims against the City while strengthening the City's case that the detective had probable cause to arrest plaintiff.

received the autopsy report, he was obligated to take at face value plaintiff's assertions that she had fed her daughter whenever she cried and had no idea that the infant was not receiving adequate nutrition. Of course, once he had the autopsy report in hand, the detective could reasonably infer that, since no physical defect in the infant's digestive system had been found, the truth more likely was that plaintiff had neglected the feeding of her daughter, contrary to her self-exculpatory statements, but fully consistent with what he had been told by plaintiff's grandmother, as recorded in the previously quoted notes of the assistant district attorney, and with plaintiff's own statement to investigators on the day of her arrest that "[the] child appeared small and thin and . . . [plaintiff's] grandmother kept after her to eat better to feed the baby better."[24] Again, the record is devoid of evidence that the failure-to-thrive theory to which plaintiff's expert testified at trial in 2011 was known to the detective when he arrested plaintiff in 1998. Further, the dissent misleadingly quotes plaintiff's expert as opining that plaintiff had done "a good job" of taking care of her daughter, ignoring the fact that this was a response to a hypothetical question seeking to elicit the opinion that the child could have become malnourished even if it were *assumed* that plaintiff had properly cared for the baby. As previously noted, while the expert could opine that it was possible for the baby to have become malnourished without neglect, he was not competent to testify that plaintiff had not neglected the infant—a factual matter completely outside his knowledge.

It bears emphasis that the primary basis for plaintiff's arrest was not an accusation made by a private individual but the official autopsy report produced by the Office of the Chief Medical Examiner of the City of New York.[25] The medical examiner's conclusions that the infant died of malnutrition, and that the malnutrition was not caused by any physically discernible inborn defect, have never been disputed. There is simply nothing in the record to negate the reasonableness of the detective's reliance on this autopsy report. Accordingly, the dissent misplaces reliance on decisions such as *Smith v County of Nas-*

---

**24.** These admissions by plaintiff are reflected in notes of the interview that were kept by an assistant district attorney.

**25.** Notably, in the instrument upon which plaintiff was arraigned, Detective Faust averred in part as follows: "Deponent states, that deponent is informed by Stephen de Roux, M.D., that he is a medical examiner who examined the deceased body of Cha-Nell Coppedge and that the cause of death is malnutrition." Again, because the medical examiner's conclusions, by themselves, sufficed to create probable cause for the arrest, any factual issues concerning what plaintiff's grandmother told the police are irrelevant.

*sau* (34 NY2d 18 [1974]), *Sital v City of New York* (60 AD3d 465 [1st Dept 2009], *lv dismissed* 13 NY3d 903 [2009]), *Carlton v Nassau County Police Dept.* (306 AD2d 365 [2d Dept 2003]) and *Stile v City of New York* (172 AD2d 743 [2d Dept 1991]), which hold only that an issue of fact exists as to probable cause where the arrest was made in reliance on the accusation of a private individual or individuals whose credibility was, in view of the record, reasonably questionable. No such credibility issue exists in this case.

For the foregoing reasons, I believe that the City is entitled to reversal of the judgment and dismissal of the complaint based on the evidence submitted to the jury at trial. It bears noting, however, that the autopsy report provided even greater support for the existence of probable cause than the jury knew. As previously noted, at plaintiff's request, the autopsy report was received into evidence in redacted form, with one of its conclusions—that the infant's "manner of death" was "homicide (parental neglect)"—withheld from the jury's consideration.[26]

Although the City did not initially object to plaintiff's request for the redaction, it seems to me that redaction was plainly erroneous. The statement by the medical examiner in the official autopsy report that the death was the result of "homicide (parental neglect)" was obviously relevant to show that the detective had a reasonable basis for placing plaintiff under arrest. As Justice Kapnick correctly observes, the conclusion of the report was being offered, not for its truth, but "for the effect it had on the mind of the detective who made the arrest."[27] And, again, it was the reasonableness of the detective's decision

---

26. Justice Acosta disparages the medical examiner's conclusion that Cha-Nell became malnourished as a result of "parental neglect" as a "baseless, unsupported opinion." Here, again, my colleague seems to be engaged in wishing away the evidence, given that no one disputes either that the child died of malnutrition or that she was found not to have suffered from any internal medical defect. In any event, the City's liability depends on whether Detective Faust (who was not a medical professional) acted reasonably in relying on the medical examiner's conclusions, not on whether the medical examiner used due care in reaching those conclusions. Moreover, the record does not include any expert evidence impugning the medical examiner's report, and we on this Court are not professionally qualified to evaluate his conclusions.

27. In this regard, Justice Kapnick aptly cites *Rivera v City of New York* (200 AD2d 379 [1st Dept 1994]), a medical malpractice action in which we held that a statement concerning the plaintiff's cocaine use made by her niece to an emergency medical technician was admissible because it was offered not for the truth of the matter asserted "but for the purpose of showing the technician's state of mind with respect to plaintiff's condition" (*id.* at 379; *see also Fleisher v City of New York*, 120 AD3d 1390, 1391-1392 [2d Dept 2014] [in a personal injury action, the "Big Apple" map was admissible "for the nonhearsay purpose of establishing that the City had notice of the alleged

to arrest in light of the information in his possession at the time—not the underlying question of whether plaintiff had neglected the infant—that was at issue at the trial of this matter. Indeed, even if the question of how Cha-Nell came to be malnourished had been at issue here (which it was not), the medical examiner's opinion that the malnutrition resulted from neglect, based on his exclusion of any medical defect, would have been admissible (*see Broun v Equitable Life Assur. Socy. of U.S.*, 69 NY2d 675, 676 [1986] [the exclusion of the medical examiner's opinion that the decedent had committed suicide, based on his examination of matters outside the jury's ken, constituted reversible error]; 58A NY Jur 2d, Evidence and Witnesses § 732). The dissent's view that the autopsy report's conclusion on the manner of death was inadmissible logically carries with it the disturbing implication that law enforcement authorities are not entitled to rely on the conclusions of the official written report of a medical examiner's office in deciding whether to make an arrest.[28]

Given that a majority of this bench declines to dismiss the complaint, Justice Sweeny and I concur with Justice Kapnick in reversing to grant the City a new trial based on the court's error in denying the City's application to reconsider the redaction of the autopsy report. After plaintiff's counsel questioned the detective, over the City's objection, about the possibility for malnutrition to result from a medical defect, the City applied to have the autopsy report published to the jury without redaction of the conclusion that the death was the result of "homicide (parental neglect)." Plainly, the City was grievously prejudiced

---

defect," not for the map's truth, and the plaintiffs therefore were not required to establish that the map qualified as a business record]).

**28.** Since the issue in this case was whether the detective had probable cause to arrest plaintiff—not whether plaintiff was actually guilty or innocent of causing the death of her child through neglect—the dissent misplaces reliance on *Schelberger v Eastern Sav. Bank* (93 AD2d 188 [1st Dept 1983], *affd* 60 NY2d 506 [1983]) and *Welz v Commercial Travelers Mut. Acc. Assn. of Am.* (266 App Div 668 [2d Dept 1943]). In each of those cases, the autopsy report's conclusion that the plaintiff's decedent had committed suicide (as claimed by the defendant insurer) was excluded because whether or not the death actually was a suicide was the ultimate issue to be resolved by the jury. Another decision inaptly cited by the dissent in this connection, *People v Eberle* (265 AD2d 881 [4th Dept 1999], *supra*), did not concern the admissibility of an autopsy report at all. The expert's testimony opining on the manner of the victim's death in *Eberle* was excluded because it "was not based on professional or medical knowledge but rather was based on inferences and conclusions drawn from various statements presented to her by the police" (*id.* at 882). Here, the medical examiner concluded that the infant's death was caused by "parental neglect" because the autopsy did not reveal any other possible cause of malnutrition.

by plaintiff's suggestion that the infant had become malnourished as the result of some internal defect when the detective had acted in reliance on the professional opinion of the Office of the Chief Medical Examiner that the malnutrition was the result of parental neglect, implicitly rejecting plaintiff's theory of an internal defect. The court ultimately denied the City's application on the ground that the City had not called a medical expert to testify concerning the cause of the infant's death. In so doing, the court overlooked that the issue for the jury to determine was the reasonableness of the detective's decision to arrest plaintiff, in light of the information in his possession at the time, not whether the death of plaintiff's daughter resulted from neglect or from some other cause.

I am astonished by the dissent's view that, in a case concerning the existence of probable cause for an arrest for homicide by parental neglect, the medical examiner's conclusion that the manner of the infant's death was "homicide (parental neglect)" was too "unduly prejudicial" to be published to the jury.[29] The statement was "prejudicial" to plaintiff's case only in the sense that it was highly probative—dispositive, in fact—of the question of whether Detective Faust had probable cause to arrest plaintiff. Otherwise admissible evidence bearing directly on the ultimate question to be determined at trial—as the medical examiner's conclusion did here—does not become subject to exclusion simply because it is devastating to the position of the party seeking to exclude it. As the question at trial was whether Detective Faust had probable cause to arrest plaintiff for criminally neglecting her daughter, the medical examiner's conclusion about the manner of the child's death went to the very heart of the case. The conclusion of the medical examiner, on which the detective indisputably relied in making the arrest, constituted direct evidence of the grounds for his action, and was not subject to exclusion for being more prejudicial than probative, as if it were merely collateral evidence of some kind. In this case, any prejudice of the evidence in question arises precisely from its extremely probative nature. Moreover, as noted by Justice Kapnick, since the jury necessarily knew that plaintiff had been arrested for causing her daughter's death through neglect, it is difficult to see how the medical examiner's conclusion would have caused her further prejudice, as opposed

---

**29.** As noted by Justice Kapnick, Justice Acosta's theory that the redacted material was "unduly prejudicial" to plaintiff was not the basis on which the trial court denied the City's application to undo the redaction.

to explaining the basis on which the challenged arrest was made.[30]

Putting aside that the redaction of the autopsy report was an error in the first instance, the denial of the City's subsequent application to publish the unredacted report to the jury constitutes an independent ground for reversal and granting of a new trial. At a minimum, plaintiff's counsel's pursuit of a theory of internal defect in her examination of the detective opened the door to the admission of the unredacted autopsy report, excluding internal defect as the cause of the malnutrition, upon which the detective relied in making the arrest. The other testimony to which the dissent refers in connection with this issue was not sufficient to cure the prejudice that accrued to the City from plaintiff's counsel, through her examination of the detective, having deliberately exploited the redaction of the autopsy report to suggest to the jury a theory of the manner of the infant's death (internal defect) that was contradicted by the redacted portion of the autopsy report, and that was not even supported by plaintiff's own expert.[31] Further, the dissent's theory (refuted by *Fleisher* [120 AD3d 1390] and *Rivera* [200 AD2d 379]) that the City should have called a medical examiner to give live testimony, on the ground that the autopsy report was "inadmissible hearsay," would have required exclusion of the report in its entirety, and is contrary to CPLR 4518 and 4520 (*see Broun*, 69 NY2d at 676 [the redaction of an autopsy report "to omit the (medical examiner's) 'suicide' conclusion was error" under

---

**30.** If the autopsy report's conclusion that Cha-Nell died as a result of "parental neglect" was correctly excluded from evidence on the ground that it was unduly prejudicial to plaintiff, as the dissent contends, then it would appear that this Court incorrectly decided *Campbell v Manhattan & Bronx Surface Tr. Operating Auth.* (81 AD2d 529 [1st Dept 1981]). In *Campbell*, an action arising from a collision between a car and a bus, we reversed a judgment after trial for the plaintiff (a passenger in the car) against the defendant bus company on the ground that the trial court had improperly excluded from evidence a post-accident hospital record indicating that the driver of the car (also a defendant in the case) had been intoxicated (*id.* at 529-530), notwithstanding any prejudice that may have accrued to the plaintiff or the driver of the car from the admission of the hospital record.

**31.** Plaintiff's counsel asked the detective whether he knew that "malnutrition can be caused from defective digestion" and that "malnutrition could be caused by defective assimilation of foods." Unmistakably, these questions evince an intention by counsel to suggest to the jury the possibility that the infant died as a result of an internal defect of her digestive system, contrary to both the undisputed facts and the medical examiner's actual conclusion—withheld from the jury's consideration—concerning the manner of death.

CPLR 4520, inter alia]; *Walters v State of New York*, 125 Misc 2d 604, 604-605 [Ct Cl 1984]).[32]

Justice Acosta accuses the three justices joining in the determination to remand the case for a new trial (Justice Sweeny, Justice Kapnick and myself) of "adopt[ing] a position . . . that is wrong on the law, barren of common sense and at odds with our duty to determine cases in accordance with fundamental principles of fairness and justice." This accusation is both intemperate and inaccurate. Plainly, the City's failure to object in the first instance to plaintiff's request to redact the "parental neglect" statement from the report bars the City from obtaining a new trial based on the initial grant of the requested redaction. The City's initial failure to object did not bar it, however, from seeking to undo the redaction to cure the prejudice caused to the defense by plaintiff's counsel's improper suggestion to the jury that the child's malnutrition might have resulted from an internal defect in her digestive system—a possibility that the medical examiner had excluded, unbeknownst to the jury because of the redaction. The City, like any other litigant, is entitled to a fair trial. Further, the "opening the door" theory on which the City relies in arguing for undoing the redaction of the autopsy report "must necessarily be approached on a case-by-case basis" and, therefore, "this principle is not readily amenable to any prescribed set of rules" (*People v Melendez*, 55 NY2d 445, 452 [1982]).

Justice Acosta finds "incongruous" my view that the City was seriously prejudiced by plaintiff's counsel's use of her examination of Detective Faust to suggest to the jury that a medical defect might have been involved in the infant's death when, as I have noted several times, plaintiff did not otherwise contend that the infant had suffered from a medical defect. Any supposed incongruity melts away when one considers that it was

---

**32.** Contrary to the dissent's position, *Walters* supports admitting the medical examiner's conclusion that the infant's death resulted from parental neglect. The finding of neglect was not a conclusion about the caregiver's intent or state of mind but simply a medical finding that, as a matter of fact, the malnutrition of which the infant died resulted from neglect of her feeding, not from any internal medical condition. This differs from a finding of "suicide," which necessarily implies that the decedent intended his or her own death. I observe that the dissent's position that the medical examiner's neglect finding was inadmissible is inconsistent with his view that plaintiff's medical expert was properly allowed to opine—based on nothing more than plaintiff's own self-serving account—that she had not neglected her daughter's feeding. In any event, and to reiterate, the question in this case was whether the medical examiner's report gave the detective, who was not a medical professional, a reasonable basis for believing that plaintiff had neglected her daughter, not how the baby had come to be malnourished.

precisely the lack of evidence of any medical defect that rendered counsel's suggestion improper. While Justice Acosta accuses me of "switch[ing] gears" in this opinion, it was in fact plaintiff's counsel who tried to have it both ways at trial by suggesting through her questioning of the detective a theory for which—as conceded by her own expert—there was no evidence. Such prejudicial gamesmanship required a more effective remedy than counsel's "mov[ing] on" upon the City's objection to her line of questioning, and thus opened the door to the admission of the "parental neglect" finding previously redacted (erroneously, but without objection) from the autopsy report. In my view, the trial court abused its discretion as a matter of law in failing to grant the City this relief, and the error, which concerned a matter at the heart of the case, cannot be deemed harmless.

Justice Acosta makes much of the principle that the resolution of evidentiary issues arising at trial, when not dictated by statutory language or directly applicable precedent, is committed to the discretion of the trial court. That principle is beyond question, as is the proposition that a reviewing court should accord a large measure of deference to a trial court's exercise of its discretion in such matters. But that a determination lies within the scope of the trial court's discretion does not mean that the discretion cannot be abused. And when an appellate court determines that the trial court abused its discretion in ruling on an evidentiary issue and thereby caused substantial prejudice to the appealing party, it is the appellate court's duty to direct that the case be retried (*see e.g. People v McLeod*, 122 AD3d 16, 18 [1st Dept 2014] [reversing the judgment on the ground that "the trial court improvidently exercised its discretion by precluding (a) proposed line of questioning . . . because the probative value of the questions . . . was not outweighed by any purported prejudice against the People" (Acosta, J.)]).

Here, plaintiff's verdict is tainted by her counsel's misleading suggestion to the jury of a possible cause of the infant's malnutrition that had been ruled out by a portion of the autopsy report that had been excluded from evidence. The trial court should have cured the prejudice to the City resulting from counsel's misleading suggestion by granting the City's application to publish the previously redacted portion of the autopsy report to the jury. Given that the evidence in question went to the heart of the case, a majority of this panel holds that the trial court's refusal to grant the City this relief was an abuse of discretion warranting reversal of the judgment and a new trial.

Moreover, as even the justices dissenting from the reversal

concede, "[t]he Appellate Division, as a branch of Supreme Court, is vested with the same discretionary power and may exercise that power, even when there has been no abuse of discretion as a matter of law by the nisi prius court" (*Small v Lorillard Tobacco Co.*, 94 NY2d 43, 52-53 [1999]; *see also Those Certain Underwriters at Lloyds, London v Occidental Gems, Inc.*, 11 NY3d 843, 845 [2008]; 11 Carmody-Wait 2d § 72:142). To be sure, appeals on such grounds are not encouraged, and we exercise our power of substitution sparingly. However, where we are presented with a plainly improvident exercise of discretion by the trial court by which a party has been prejudiced on a pivotal issue in the case, reversal is appropriate even if the court arguably did not err as a matter of law. The power of the Appellate Division to substitute its discretion for that of the trial court extends to rulings on evidentiary issues (*see e.g. People v Agina*, 103 AD3d 739, 740-741 [2d Dept 2013] [reversing the judgment "on the facts and as a matter of discretion" because the trial court "improvidently exercised its discretion" in admitting *Molineux* evidence, the "probative value (of which) . . . was outweighed by its unfair prejudicial effect"]; *see also id.* at 743; *Barnes v City of New York*, 296 AD2d 330, 332 [1st Dept 2002] [reversing a judgment after trial based on the exclusion of relevant evidence, which this Court found, contrary to the view of the trial court, to have "probative value (that) outweighs any incidental prejudicial effect"]; *cf. Andon v 302-304 Mott St. Assoc.*, 94 NY2d 740, 745-746 [2000] [in a lead-paint personal injury action, affirming, as an exercise of the Appellate Division's power to substitute its discretion for that of the trial court, this Court's reversal of an order granting a defense request for discovery of the plaintiff mother's IQ]).

Here, as noted, a majority of this panel concludes that the trial court abused its discretion as a matter of law in refusing to permit the jury to see key evidence bearing on the existence of probable cause after plaintiff's counsel took advantage of the redaction of that evidence to mislead the jury about the medical examiner's conclusions. Even if this ruling did not constitute error as a matter of law (which it did), an exercise of judicial discretion so unwise, and so prejudicial to the aggrieved party, would warrant reversal on the facts, in the exercise of this Court's own discretion.[33]

I conclude by observing that the refusal of a majority of this

---

**33.** We reject the dissent's assertion that it is somehow "unfair" or "smack[ing] of arbitrariness" to require a retrial when the first trial was itself unfair to the losing party as a result of the trial court's unwise application of its discretionary power. Nor do we understand the dissent's contention

bench to dismiss the complaint rests on the premise that it could be rationally concluded that the medical examiner's official finding that an infant, anatomically and physiologically normal at birth, starved to death after only 5½ weeks of life, did not provide probable cause for charging the infant's sole care-giver with criminal neglect. I cannot accept this premise, and therefore believe that we should reverse the denial of the City's motion for judgment dismissing the complaint notwithstanding the verdict. Given, however, that a majority has not voted to grant the City the judgment as a matter of law to which it is entitled, I concur with Justice Kapnick in granting the City the alternative relief for which it argues, namely, a new trial based on the trial court's prejudicial error, as previously discussed, in failing to publish to the jury the medical examiner's conclusion that the "manner" of plaintiff's infant daughter's death was "homicide (parental neglect)."

Kapnick, J., concurs in a separate memorandum as follows: While I agree with Justices Acosta and Manzanet-Daniels that the issue of whether or not there was probable cause to arrest plaintiff was properly submitted to the jury because there was " 'conflicting evidence, from which reasonable persons might draw different inferences.' " (*Parkin v Cornell Univ.*, 78 NY2d 523, 529 [1991], quoting *Veras v Truth Verification Corp.*, 87 AD2d 381, 384 [1st Dept 1982], *affd* 57 NY2d 947 [1982].) I believe that the trial court's denial of defendant's application to admit the unredacted medical examiner's report into evidence was reversible error. The redacted portion of the report contained the medical examiner's conclusion that the manner of death was "homicide (parental neglect)." While this evidence was properly redacted in the first instance, in light of defendant's failure to oppose plaintiff's motion in limine, it was error to keep it out when defendant subsequently moved for its admission after plaintiff "opened the door" and elicited testimony from Detective Faust suggesting that the baby's death resulted from malnutrition caused by defective digestion or some other underlying medical condition of the infant, when the autopsy report contained no such conclusions. To the extent that the trial court sustained the redaction because defendant did not call an expert medical witness to testify as to the manner of death, this too was error since the redacted conclusion was not being offered for its truth, i.e., that the infant's manner of death

that it is somehow "inconsistent" with the trial-by-jury system for this Court to reverse and remand for a new trial—which will be conducted, like the previous trial, before a jury—based upon an erroneous and prejudicial evidentiary ruling by the court at the first trial.

was in fact "homicide (parental neglect),"[1] but rather, for the effect it had on the mind of the detective who made the arrest (*Rivera v City of New York*, 200 AD2d 379 [1st Dept 1994]). Therefore, an expert medical witness was not necessary and the trial court certainly could have given a limiting instruction to the jury on how to treat this evidence during deliberations.[2] Moreover, the dissent's conclusion that this statement was properly excluded because it states an inadmissible opinion as to the manner of death is supported by cases where the manner of death was the ultimate issue in the case, unlike here, where probable cause is the ultimate issue, as Justice Friedman aptly discusses in footnote 28 of his opinion.

I respectfully disagree with the conclusion that even if the excluded statement was admissible to show the detective's state of mind at the time of the arrest, it was still properly excluded because it was more prejudicial than probative. While a trial court certainly may exercise its discretion to exclude otherwise technically admissible evidence when it finds that evidence to be more prejudicial than probative (*see People v Smith*, 22 NY3d 462, 467 [2013]),[3] that analysis was not undertaken here. Rather, the trial court merely ruled that the autopsy report would remain redacted because "[t]here was no expert to testify that there was, in fact, poor parental neglect, and so, as a conclusion of law, not as a conclusion of medicine, I'm not permitting that portion of the medical examiner's report, the autopsy to be presented to this jury."

Nor can it be said that the words "homicide (parental neglect)" are so incendiary that their probative value on the issue of probable cause is "substantially outweighed by the danger that it will unfairly prejudice [plaintiff] or mislead the jury" (*People v Marte*, 12 NY3d 583, 589 [2009] [internal quotation marks omitted], *cert denied* 559 US 941 [2010]). This is especially true here, where the fact that plaintiff was charged with homicide was not a secret to the jury, and in fact, the trial court

1. It bears noting that the entire autopsy report, *except for these three words*, went into evidence without the testimony of a medical expert.

2. While the criminal charges against plaintiff were ultimately dismissed, it was important that the jury have the opportunity to see what was available to the arresting officer at the time, to assist the jury in making its determination as to whether there was probable cause for the arrest or whether the arrest was made "on a flimsy record," as Justice Acosta suggests.

3. I note, however, that *People v Smith* does involve a different legal issue of whether redundant testimony regarding identification of the victim or alleged assailant, even if not hearsay, can be excluded if it is more prejudicial than probative.

charged the jury on the law of homicide. Moreover, the proposition for which the dissent cites *Matter of State of New York v Floyd Y.* (22 NY3d 95 [2013]) is inapposite here, where the evidence in question is not hearsay by definition because it would not be entered into evidence for its truth.

Finally, it cannot be said that the exclusion of this evidence was harmless error or that the excluded evidence would not have had a substantial influence in producing a different result (CPLR 2002; *see also Barbagallo v Americana Corp.*, 25 NY2d 655, 656 [1969] [directing a new trial where it could not be concluded that the jury would not have been influenced by details of excluded telephone conversations which were relevant to establish the duration and depth of the defendant's alleged fear, not for the truth of their contents]).[4] Therefore, although conscious of the burdens a new trial will place upon plaintiff, I would nonetheless direct a new trial.

Acosta and Manzanet-Daniels, JJ., dissent in a memorandum by Acosta, J., as follows: Plaintiff Tatiana Cheeks, a young, poor, single mother living in the Bronx, and her infant daughter Cha-Nell, were so tragically neglected and ignored by the local medical establishment that baby Cha-Nell died, despite the best efforts of her attentive mother to nourish and care for her.

The mother's tragedy was then compounded by the rush to judgment by the New York City Police Department, which arrested her on a flimsy record and charged her with the depraved murder of her baby.

Once it was determined that these criminal charges were bogus, the charges were dropped.[1] To obtain a measure of justice, Tatiana brought a civil action for malicious prosecution against the City of New York, the employer of the detective who ignored all the signs that pointed to a noncriminal cause of the

---

**4.** The case of *Matter of State of New York v John S.* (23 NY3d 326 [2014]), upon which Justice Acosta relies for the proposition that the trial court did not abuse its discretion when it decided not to admit the unredacted autopsy report is not dispositive of the issue at hand. *John S.* arises out of a Mental Hygiene Law article 10 proceeding and its discussion regarding evidentiary rulings focuses specifically on the extent to which a court may admit hearsay evidence in such article 10 proceedings. While the Court in that case did remark that trial courts are "generally accorded broad discretion in making evidentiary rulings, which are entitled to deference on appeal absent an abuse of discretion," (*id.* at 344), it makes no reference to the applicability of CPLR 2002, which is essentially a codification of the "harmless error" doctrine in civil cases, is "applicable to appeals" and is used "most frequently in connection with a trial court's rulings on evidence" (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 2002 at 282).

**1.** Although Justice Friedman takes issue with my characterization of the charges as "bogus," the fact remains that criminal charges were not pursued.

infant's death, and instead treated this grieving mother as unworthy of belief. An expert later testified that Cha-Nell most probably died as a result of what is medically known as a failure to thrive.

A Bronx jury finally recognized the injustice done and awarded plaintiff money damages. But now, on review, a majority of this panel reverses the hard-earned verdict Tatiana won, requiring her to tell her story in open court again (almost 16 years after the death of her child) and re-live those terrifying times once more in an expensive trial.[2] I dissent, perceiving no legitimate basis for awarding a new trial. In fact, I am troubled that my colleagues would grant a new trial on the basis of a discretionary evidentiary ruling supported by ample precedent and to which the City itself consented. I agree with the majority that we have an obligation to our oath of office, but that obligation does not require us to adopt a position advanced by the City that is wrong on the law, barren of common sense and at odds with our duty to determine cases in accordance with fundamental principles of fairness and justice. I do, however, believe that the amount of damages awarded by the jury was excessive.

Facts

Plaintiff Tatiana Cheek's daughter, Cha-Nell, was born on February 16, 1998, weighing six pounds, five ounces. Plaintiff, who also had a 15-month-old son,[3] was a 21-year-old single mother. She lived with her grandmother and two younger siblings. Plaintiff was encouraged at the hospital to breast feed her daughter, which she did when she returned home. She was given an appointment to have the child seen at the clinic one week later. When she went to the clinic, she was told that the doctor would not see her because plaintiff did not have a

---

**2.** Justice Friedman even goes so far as to insinuate that Tatiana was responsible for her child's death for failing to take her to the emergency room for "any urgently needed attention" instead of just attempting a follow-up visit at a clinic a week after the child was born. But, not only did a doctor at the clinic refuse to examine Cha-Nell because Tatiana did not have Medicaid, Tatiana testified that the nurse who attended Cha-Nell did only a cursory examination.

**3.** After her arrest in the underlying case, the New York City Administration for Children's Services filed a petition in Kings County Family Court alleging derivative abuse with regard to her son. He was temporarily removed from her custody and placed in a relative's care. Plaintiff regained custody on March 23, 2000. In its decision, Family Court cited testimony of plaintiff's grandmother and step grandfather that Cha-Nell appeared " 'small' but otherwise unexceptional just before her death," and concluded that "the child's malnourished condition was not evident to these ordinarily lay persons at that time."

Medicaid Card for her child or the $25 to pay the fee in the absence of a card. Instead, a nurse lifted the baby's shirt, gave her a cursory examination, and said nothing about her weight.

Plaintiff followed up with her public assistance worker, who told her it would take some time and additional documents to get a card. She was advised to contact the Department of Health regarding the child's vaccination shots because she did not think she would have the Medicaid card in time. She did so and was told to bring her child in for vaccination shots at six weeks.

Plaintiff testified that she continued to breast feed the child as often as she seemed hungry, approximately every 2½ hours. She stated, "I thought I was feeding her like you feed a normal baby," meaning the "[b]aby cries and you feed the baby." Plaintiff testified that she did not realize the baby had not gained weight at three weeks old, or lost weight prior to her death. Her grandmother, who had spoken to the police just prior to plaintiff's arrest but was deceased by the time of trial, had commented that the baby was "puny," "a little thing just like [plaintiff]," "and her father [wa]s not bigger than a minute." Plaintiff did not take these comments as an indication that her grandmother thought the child was "unhealthy." Thus, it comes as no surprise that she never took Cha-Nell to an emergency room at a local hospital, but instead sought medical follow-up at a clinic. Cha-Nell died approximately 5½ weeks after she was born.

Detective Donald Faust of the New York City Police Department was assigned to lead an investigation into the baby's death. Faust saw the baby's body at the hospital and saw no signs of abuse, foul play, or anything abnormal at that time. The emergency room doctor also found no apparent signs of abuse, nor did the medical examiner who conducted the autopsy the next day, on March 28, 1998. The medical examiner further told Faust on March 28 "that the baby appeared to be well fed." The medical examiner also told Detective Faust that he found milk curd (white curd) in the baby's stomach and "partially digested food in the intestinal track."

Plaintiff was "cooperative" and forthcoming when Detective Faust questioned her later that day. Plaintiff told him that she breastfed the baby the night before and she recounted how they slept on the sofa together, and she discovered the next morning that the baby was not breathing. At that time, he had no basis for believing a crime had been committed, and Faust considered the case "closed."

On May 26, 1998, Detective Faust received the medical examiner's autopsy report, which concluded that the cause of

death was "malnutrition" based on various physical findings, including that the baby's weight at the autopsy was below her birth weight and well below the fifth percentile for her age. At birth, the baby's weight was in the 25th percentile. The report also noted that she had scant body fat, low organ weight, and atrophy of her organs.

Other than the medical examiner's unsubstantiated statement "manner of death: homicide (parental neglect)," an opinion redacted from the autopsy report at trial without objection from the City, there was no indication in the report that plaintiff intentionally, recklessly or negligently starved Cha-Nell to death. Indeed, on page 3 of the report, under the sub-heading "Digestive System," the report states: "The esophagus is unremarkable. The unremarkable stomach contains 20 gm of curdy, white material. The small intestines, large intestines, and appendix are unremarkable. The small intestines contains abundant yellow chyme. The proximal portion of the colon contains mostly liquified yellow stool. The distal portion of the colon contains more formed, yellow-brown stool. The stool is abundant. The pancreas has normal external architecture. The parenchyma is brown."

These findings, rather than suggesting malnutrition due to parental neglect, seem to indicate the opposite. That is, that plaintiff was in fact doing her best to feed her infant daughter. Thus, plaintiff's assertion that she had been breast feeding her daughter is hardly an "uncorroborated self-exculpatory claim" as Justice Friedman states. Significantly, the report also does not reflect that any scans were conducted to determine metabolic disorders.

Further, under the sub-heading "Musculoskeletal System," the report notes: "The clavicles, sternum, ribs, vertebral column, and pelvis are unremarkable. There are no fractures. The red-brown skeletal muscles have a normal architecture. There are no areas of subcutaneous or intramuscular hemorrhage." Again, there is no indication of parental neglect.[4] Page five indicates that no drugs or alcohol were found in the infant's blood. Pages seven to nine indicate that the brain had no abnormalities except for some congestion, but does not otherwise state that this congestion was due to neglect. Although on page 33 of the report, the medical examiner (ME) notes that he learned from ACS that plaintiff was a drug abuser and that 13 months earlier, she had left her then five-month-old son home

---

**4.** In quoting this section of the autopsy report, my intent was not to mystify my colleague, but merely to show that there was no evidence of any form of neglect or abuse in the report.

alone, ACS also reported that there have been "no further problems." Notwithstanding the lack of evidence indicating parental neglect, the ME nonetheless notes on page 36 of the report that the "case is currently heading in the direction of a [h]omicide due to malnutrition" because with "most of the test results now in[,] [he] was unable to find a medical explanation." In other words, since the ME could not find a medical reason for the child's death, the mother must have neglected to nourish the child despite evidence to the contrary.

After Faust received the autopsy report, he interviewed plaintiff's grandmother on May 26, 1998, the day before plaintiff's arrest. The assistant district attorney audiotaped the statement and kept the tape. At trial, which occurred 13 years later, Faust recalled certain statements made by the grandmother at that interview. Plaintiff's grandmother told him "that the baby had little rabbit legs," and that she did not trust plaintiff to watch plaintiff's younger siblings because " 'I wouldn't let her watch my cat, and I don't like cats.' " Faust also recalled the grandmother's statements that she told plaintiff to take the baby to the hospital because she looked sick, was too skinny and was not gaining weight, and that plaintiff refused to do so. He acknowledged, however, that the grandmother's statements about the "little rabbit legs," about not allowing plaintiff to watch a cat, and that she advised plaintiff to get the child medical attention were not contained in the summary of the audiotape recorded 13 years earlier.

On May 27, 1998 plaintiff voluntarily went to the precinct for questioning and gave a statement. She stated that her grandmother told her that she needed to drink more milk "so I told her . . . that I would ask the doctor if my breast milk was good and if not I would give her . . . Enfamil." She also recounted her efforts to have Cha-Nell be seen at a clinic a week after her birth only to be turned away for lack of cash or a Medicaid card, her efforts to obtain that card and conversations with the Board of Health regarding vaccines for the baby. She was arrested later that evening without a warrant and charged with the death of her daughter. Detective Faust testified that the baby's death from malnutrition was not the sole basis for the arrest: "By that one singular fact of the child dying from malnutrition, no, I would not make an arrest in that case." Although he also took into consideration that the malnutrition did not result from any internal medical defect in deciding to re-open the investigation, he testified that the grandmother's statements also entered into his decision to arrest plaintiff:

"Q. Anything that the grandmother told you, sir, was that your basis for believing that a crime had been committed?

"[Defendants' counsel]: Objection

"THE COURT: Was that his basis? Well, do you mean was it his sole basis?

"Q. Was it one of the bases in which you believed that a crime had been committed?

"A. Yes."

Earlier in Detective Faust's testimony, the Court posed the question:

"THE COURT: All right, so you based your decision to arrest based on the Medical Examiner's statement?

"THE WITNESS: Not, only, sir.

"THE COURT: In addition to the Medical Examiner's.

"THE WITNESS: Yeah, it was part of the Medical Examiner's statement, it was part of my investigation, it was part of [the] statement from the [plaintiff] herself at the time." The charges against plaintiff were eventually dismissed.

Dr. Harold Raucher testified on plaintiff's behalf. At the time of trial, he was a board certified, practicing pediatrician, and had been teaching at Mt. Sinai Hospital's pediatrics department throughout his 29 years of private practice. He was also president of the New York Pediatrics Society. According to Dr. Raucher, most newborn babies lose five to ten percent of their weight in the "first few days," and most breastfed babies don't receive much milk "because the mother's milk hasn't come in yet." Infants start to gain weight after three to four days, but they generally do not attain their birth weight until they are close to two weeks old.

Dr. Raucher explained a concept known as "failure to thrive," which is essentially a failure to grow, physically or psychologically. In such cases, unlike a mother who bottle feeds a baby, a breastfeeding mother "has no idea as to the amount of milk that is transferred from her to the baby," so if the amount of milk is insufficient, "they usually don't know it." The only way to know is to weigh the baby before and after feeding. Dr. Raucher further testified that there are no "classic signs" of malnutrition, such as crying or sleeping long hours.

Dr. Raucher ultimately opined that Cha-Nell died of malnutrition, because "the mother was unaware that the child was not getting enough calories, and the cause of the malnutrition was a low quantity of breast milk." Based on autopsy evidence of milk in the stomach, he concluded that the baby was being fed prior to her death. Thus, "if there was malnutrition, the only way that it was going to happen was if the baby was not receiving enough calories . . . . [T]he mother was breastfeeding the right

number of times and [the] right way, the right schedule . . . . [T]here was just not enough milk. There was some—there just wasn't enough to grow on." He said, "[E]verything that I saw led me to the conclusion that [plaintiff] had done a good job. She had done what a mother is supposed to do." Dr. Raucher found "no evidence of improper care on the part of the mother."[5]

The City did not call the medical examiner nor any medical experts to testify at trial. In fact, although the City's main argument on appeal is whether the issue of probable cause to arrest should have been decided as a matter of law and not by a jury, the City failed to seek dismissal by filing a timely motion for summary judgment. Instead, it placed the issue before a jury, lost, and now it is complaining that the issue should never had gone to the jury in the first place. At trial, the City defended its strategy by noting that it had sought dismissal by filing an untimely summary judgment motion. The untimely filing, however, had the same affect as not filing a motion at all (*see Brill v City of New York*, 2 NY3d 648 [2004]); this is especially true when the denial of the untimely motion is not before us on appeal. The City should not be commended or rewarded for failing to follow procedural rules that have been in place for quite some time (*see also John v Bastien*, 178 Misc 2d 664 [Civ Ct, Kings County 1998], [cited by *Brill* at 652, with approval]).

Analysis

The Issue of Probable Cause Was Properly Submitted to the Jury

Contrary to the view of Justices Friedman and Sweeny, the court properly denied defendant's motion for judgment notwithstanding the verdict as a matter of law. Viewing the evidence in the light most favorable to plaintiff, there was a permissible inference that could lead a rational jury, as it did here, to conclude that there was no probable cause to arrest plaintiff (*see Parkin v Cornell Univ.*, 78 NY2d 523, 529 [1991] ["the issue of probable cause is a question of law to be decided by the court only where there is no real dispute as to the facts or the proper inferences to be drawn from such facts"], citing *Veras v Truth Verification Corp.*, 87 AD2d 381, 384 [1st Dept 1982], *affd* 57 NY2d 947 [1982]). "Where there is 'conflicting evidence, from which reasonable persons might draw different inferences . . . the question [is] for the jury' " (*Parkin*, 78 NY2d at 529, quoting *Veras*, 87 AD2d at 384; *see Sital v City of New York*, 60 AD3d 465 [1st Dept 2009], *lv dismissed* 13 NY3d 903 [2009]).

---

**5.** Although Justice Friedman asserts that this evidence was inadmissible expert testimony, the City never objected to it at trial.

Thus, in the absence of a defense to either claim as a matter of law (see e.g. Hernandez v City of New York, 100 AD3d 433 [1st Dept 2012], lv dismissed 21 NY3d 1037 [2013]), the claims of false arrest and malicious prosecution were properly submitted to the jury.

The evidence demonstrated that notwithstanding the conclusion in the autopsy report that the child died of malnutrition, the detective testified that two medical professionals who viewed the child's body saw no apparent signs of neglect or abuse, found food in the child's stomach, and concluded that she appeared to be well fed. Thus, there was no indication that plaintiff had either intentionally, recklessly or negligently starved the infant. The jury reasonably could have found that, at the time of arrest, there was no basis for a prudent person to believe that an offense had been committed. That is, that the mother did not act recklessly or negligently in feeding the child and/or not realizing that the child was malnourished, or did not in fact commit any offense whatsoever. The jury also reasonably could have rejected the detective's testimony that the grandmother told him that plaintiff had refused the grandmother's request that she take the child to the hospital because she appeared too thin. He kept no record of that statement, made 13 years before trial, and the City failed to introduce the audiotape purportedly containing that statement. Although Justice Friedman accuses me of raising a "red herring" by citing to plaintiff's failed attempt to have Cha-Nell seen by a doctor at a clinic, I believe that her efforts to have Cha-Nell seen by a doctor are relevant to the issue of probable cause. Indeed, Detective Faust admitted he would not have arrested plaintiff based on the "singular fact of the child dying from malnutrition," and, after extensive questioning, he admitted that plaintiff explained her failed attempt to have Cha-Nell seen by a doctor prior to her arrest. Thus, it is not my position that the detective should have "intuited" failure to thrive as the cause of death, but rather, that the contents of the report along with the other evidence did not provide probable cause to believe that a crime had been committed. Moreover, under the circumstances of this case, it cannot be said that "it was reasonable, as a matter of law," for the detective to discredit plaintiff's account.

As the jury could have reasonably concluded there was no probable cause, it also could have inferred malice from these same facts, particularly the detective's reliance on the grandmother's statements and his disregard of evidence that the child was being fed and was not otherwise neglected or abused (see Fortunato v City of New York, 63 AD3d 880 [2d Dept 2009]).

Justice Friedman, citing *Lewis v Caputo* (95 AD3d 262 [1st Dept 2012], *revd* 20 NY3d 906 [2012]), concludes that three facts known to the detective at the time of arrest conclusively established probable cause as a matter of law, namely: that the autopsy report stated that cause of death was malnutrition; that plaintiff was the child's sole custodian; and that there was no indication in the report that the child's digestive system was defective. It is true that in *Lewis v Caputo*, where only one reasonable inference could be drawn from the facts regarding probable cause, it was held that the issue of probable cause should not go before the jury. However, the detective here was privy to other evidence that could have led a reasonably prudent person to conclude that plaintiff had committed no offenses even though the cause of death was malnutrition. This is particularly so in this case because the detective, in addition to having been told by two medical professionals that there was no sign of neglect or abuse, was informed by the mother, before he placed her under arrest, that she was breast-feeding the child since being discharged from the hospital, had attempted to have her child seen by a doctor four weeks later but was rejected because she had no insurance, made efforts to obtain Medicaid, and contacted the Board of Health regarding vaccinations. In fact, a careful reading of the report should have alerted the detective that the medical examiner's redacted opinion, "homicide (parental neglect)," was not even supported by the contents of the report.

Contrary to Justice Friedman's conclusion, *Agront v City of New York* (294 AD2d 189 [2002]) does not dictate a different result. Justice Friedman concludes that, pursuant to *Agront,* any conflicting evidence as to how the child died was relevant only to the issue of whether guilt beyond a reasonable doubt could have been proven at a criminal trial, but not to the initial determination as to the existence of probable cause. However, *Agront* makes very clear that finding probable cause as a matter of law is not only "based upon such grounds as would induce an ordinarily prudent and cautious person, under the circumstances, to believe that plaintiff had committed the [crime] as a matter of law," it also requires that "the facts leading up to the arrest, and the inferences to be drawn therefrom, . . . not [be] in dispute" (*id.* at 189 [internal quotation marks omitted], citing *Parkin*, 78 NY2d at 529). Where the inferences are in dispute, however, the issue is for the jury to decide as there can be no finding of probable cause as a matter of law. Indeed, as noted above, the Court of Appeals has repeatedly held that "[w]here there is 'conflicting evidence, from which reasonable persons might draw different inferences . . . the question [of

probable cause is] for the jury" (*Parkin,* ·78 NY2d at 529, citing *Veras,* 87 AD2d at 384, *affd* 57 NY2d 947 [1982]).

*Agront* and *Lewis v Caputo* do not hold otherwise. In fact, the Court of Appeals in *Caputo* cited to its *Veras* decision with approval (20 NY3d at 907). Thus, the fact that in *Caputo,* a possession of stolen property case, probable cause should have been decided as a matter of law given its particular facts says nothing as to whether probable cause should have gone to the jury or been decided as a matter of law in this case. Significantly, the Court tempered its holding in *Caputo* by also citing, as comparative authority, to *Smith v County of Nassau* (34 NY2d 18, 25 [1974]), where it held that "because the evidence gave rise to inferences on which reasonable people might differ, the Trial Judge properly submitted the question of reasonable cause to the jury."

Here, as noted above, the inference that the child's death was caused by any criminal conduct on the mother's part was clearly in dispute. The dissent misses the point by relying on the detective's blind following of the autopsy report notwithstanding the other evidence, including the autopsy findings that "[t]he small intestines contains abundant yellow chyme[,]" "[t]he proximal portion of the colon contains mostly liquified yellow stool[,]" "[t]he distal portion of the colon contains more formed, yellow-brown stool[,]" and that "[t]he stool is abundant" indicating that the child was being fed. Although these finding do not show that Cha-Nell had been " 'diligently fed throughout her short life," as my colleague notes, it certainly lends credence to plaintiff's assertion that she was breast feeding her child.

A detective may not ignore compelling evidence that plaintiff had not engaged in any criminal conduct. For example, in *Sital v City of New York* (60 AD3d at 466), where the arresting officer had doubts about the credibility of the identified citizen complainant who had accused the plaintiff of a fatal shooting, and the identification by the complainant was arguably contradicted by physical evidence at the crime scene that was consistent with the conflicting statement of an independent eyewitness, the Court observed that the officer's failure to make further inquiry of potential eyewitnesses was unreasonable under the circumstances, and evidenced a lack of probable cause. Similarly, in *Stile v City of New York* (172 AD2d 743 [2d Dept 1991]), a false arrest claim was upheld where the plaintiff was arrested without a warrant based on a claim by friends of the detective that the plaintiff had stolen a ring while visiting their home, and the detective had ignored not only the plaintiff's

protestations of innocence, but also his attorney's insistence that the detective should investigate an earlier incident in which his friends had similarly accused another man of stealing a ring and later dropped the charges. And, in *Carlton v Nassau County Police Dept.* (306 AD2d 365 [2d Dept 2003]), the Court found an issue of fact as to whether police officers had probable cause to arrest the plaintiff at his home without a warrant for theft of services, where although the restaurant owner had provided an affidavit stating that the plaintiff left the restaurant without paying the bill, the arresting officers knew that the bill was disputed and that the plaintiff had provided his business card to the restaurant owner, facts that the Court said would have prompted a reasonable person to make further inquiry.

These rulings are particularly applicable in this case, where the detective knew that plaintiff, a young mother, was breast-feeding her child, as opposed to using formula, and was therefore unable to monitor the child's intake of nutrients. The trial court's decision to leave the issue of probable cause to the jury, and the jury's determination of that issue, were both proper.

The record also demonstrates that the verdict was not against the weight of the evidence (*see McDermott v Coffee Beanery, Ltd.*, 9 AD3d 195, 206 [1st Dept 2004]). Nor is there any other legitimate reason to order a new trial.

Plaintiff Did Not Open the Door to Admission of the Unredacted Autopsy Report

While Justice Kapnick agrees with me that the issue of probable cause was properly submitted to the jury, thus forming a majority on this issue (Acosta, Manzanet-Daniels and Kapnick), she joins Justices Friedman's position (now a majority with Justice Sweeny) that the City is nonetheless entitled to a new trial because of a discretionary evidentiary ruling. According to the majority on this issue, the trial court erred when it denied the City's request to allow the medical examiner's baseless, unsupported opinion, "homicide (parental neglect)," to go before the jury even though the City agreed to the redaction in the first instance and plaintiff did not thereafter open the door to its introduction.[6] I fail to see how plaintiff opened the door by plaintiff's brief questioning of Detective Faust regarding

6. Justice Friedman, with Justice Sweeny's acquiescence, unfairly characterizes, as "intemperate and inaccurate" my assertion that the majority, in essence, is trying the case for the City. My comment was meant to highlight the fact that the majority is granting the City a reversal of a jury determination based on a trial judge's discretionary ruling (that is, declining to unredact the autopsy report), where the City charted its own course by

whether the child might have died from malnutrition due to an underlying medical condition. Not only did plaintiff's counsel move on after the City objected, but Detective Faust testified that he concluded from his conversation with the medical examiner that "the baby did not die from . . . some preexisting congenital condition." Indeed, as Justice Friedman noted in the first paragraph of his writing, the conclusion that the infant "died of malnutrition, and that the malnutrition was not due to any detectable defect in her digestive system . . . has never been questioned, *not even by plaintiff* or the medical expert who testified on her behalf in this action" (emphasis added). He went on to "reiterate [later on in his opinion that plaintiff's] medical expert did not take issue with the medical examiner's conclusion that the baby had died from malnutrition and that the malnutrition had not been caused by any observed physical or chemical defect." It seems incongruous for Justice Friedman to later switch gears to claim that "the City was grievously prejudiced by plaintiff's suggestion that the infant had become malnourished as the result of some internal defect . . . ." To be sure, the majority cannot complain that plaintiff opened the door by suggesting that the infant died of a digestive problem while simultaneously acknowledging that the issue was never in dispute. Thus, refusing the City's request to vacate the trial court's earlier ruling under these circumstances simply does not come close to being an abuse of discretion (*People v Massie*, 2 NY3d 179, 184 [2004] ["a trial court should decide 'door-opening' issues *in its discretion, by considering whether, and to what extent, the evidence or argument said to open the door is incomplete and misleading, and what if any otherwise inadmissible evidence is reasonably necessary to correct the misleading impression*"]; *Matter of Virginia C. [Sharri A.]*, 88 AD3d 514 [1st Dept 2011] [same]; *Kane v Triborough Bridge & Tunnel Auth.*, 64 AD3d 544 [2d Dept 2009] [same]). On appeal, our focus should be on whether the court abused its discretion so significantly in refusing the City's request to allow a previously excluded statement (without objection from the City) to come into evidence as to warrant the extraordinary remedy of setting aside a jury verdict (*Matter of State of New York v John S.*, 23 NY3d 326, 344 [2014], *supra* [trial courts are "generally ac-

consenting to the redaction of the autopsy report in the first instance. While my choice of words may seem sharp, the majority's substitution of its discretion in this case is not only unfair to the trial court, the jury, and plaintiff, but unsupported by applicable law. The trial court simply did not abuse its discretion so significantly (if at all) that it warrants the extraordinary remedy of setting aside the jury verdict (*Matter of State of New York v John S.*, 23 NY3d 326 [2014]).

corded broad discretion in making evidentiary rulings, which are entitled to deference on appeal absent an abuse of discretion"]; *see also General Electric Co. v Joiner*, 522 US 136, 142 [1997] [an "appellate court will not reverse (based on an evidentiary ruling), unless the ruling is manifestly erroneous" (internal quotation marks omitted)]; *Old Chief v United States*, 519 US 172 [1997]).

Moreover, this type of opinion evidence is ordinarily inadmissible (*see Welz v Commercial Travelers Mut. Acc. Assn. of Am.*, 266 App Div 668 [2d Dept 1943]; *see also Schelberger v Eastern Sav. Bank*, 93 AD2d 188, 198 [1st Dept 1983] ["the conclusion set forth in the report of the medical examiner, which opined that death resulted from suicide, is of no avail since the opinion expressed in the autopsy as to the cause of death is inadmissible as hearsay"], *affd* 60 NY2d 506 [1983]). Indeed, *Walters v State of New York* (125 Misc 2d 604 [Ct Cl 1984]), cited by Justice Friedman, supports this position. In *Walters*, the court distinguished *Schelberger*, noting that it "involved a conclusion in an autopsy report to the effect that the cause of death was suicide. A coroner is not qualified, based merely on his dissection of a cadaver, to render an opinion concerning a deceased's intention to take his own life. He is, however, competent to state, if he can, his diagnosis as to the medical cause of death" (125 Misc 2d at 605). Here, likewise, the conclusion in the autopsy report that Cha-Nell died of malnutrition was admissible, but not the conclusion that malnutrition was due to "homicide (parental neglect)."

I am troubled by the suggestion that the unredacted report should have been admitted into evidence in any event because it was relevant and would have provided even greater support for the existence of probable cause. In fact, as the trial court noted, the City made no "attempt[s] to reach a medical examiner or at least an expert witness, if not at trial, at least with a motion for summary judgment." The court went on to note that at trial, the City "could have subpoenaed a medical examiner, or if the medical examiner was unavailable, an examining physician to review the records as to the conclusion reached by the medical examiner." Having failed to properly present at trial the evidence it now claims was lacking, the City should not be permitted by the majority to avoid the repercussions of its choice. To be sure, however, whether the City had a legitimate basis for admission of the unredacted report in this case is of no moment inasmuch as it consented to the redacted version (unlike *Broun v Equitable Life Assur. Socy. of U. S.*, 69 NY2d 675 [1986], cited by Justice Friedman, where it appears that defendant did not

consent to the redaction). The issue, therefore, is whether plaintiff later opened the door through improper questioning, which she clearly did not. Thus, it is irrelevant whether the redacted version could have come in for a nonhearsay purpose (*see Rivera v City of New York*, 200 AD2d 379 [1st Dept 1994]; *Fleisher v City of New York*, 120 AD3d 1390 [2d Dept 2014]) or pursuant to the reasoning in *Campbell v Manhattan & Bronx Surface Tr. Operating Auth.* (81 AD2d 529 [1st Dept 1981]).

Although this Court has the power to substitute its discretion for that of the nisi prius court even when there has been no abuse of discretion as a matter of law (*Small v Lorillard Tobacco Co.*, 94 NY2d 43, 52-53 [1999]), I fail to see the wisdom in doing so in this case. To be sure, for this Court to vacate a jury determination after the parties have been subjected to a long, expensive and arduous jury trial (including any hardship endured by the jurors) not because a trial judge erred, but solely because this Court has the power to do so, is not only unfair to the prevailing party and the bar and a waste of judicial time and resources, but smacks of arbitrariness.[7] Moreover, it is inconsistent with our form of jurisprudence of having disputes settled by a jury of peers, a jurisprudence that is anchored on sound judicial and public policy considerations.

Here, the trial court clearly did not abuse its discretion inasmuch as plaintiff did not open the door for the admission of the unredacted report. In any event, allowing the opinion "homicide (parental neglect)" placed before a jury without having a medical examiner, subject to cross-examination, explain to the jury the basis and reasonableness of his conclusion (especially given that nothing in the report suggested neglect on the mother's part), would have been unduly prejudicial to plaintiff.

---

7. Justice Friedman misconstrues my position by citing to *Barnes v City of New York* (296 AD2d 330 [1st Dept 2002]), where this Court found that the trial court erred in excluding certain evidence. I do not dispute that this Court reverses when there has been trial error and the error is deemed not to be harmless in the facts of the case. What I am saying is that we should review the trial court's decision regarding whether plaintiff opened the door under the abuse of discretion standard rather than simply substituting our discretion. I do not believe that our position should be that even though the trial court did not abuse its discretion or even exercised it improvidently we are reversing a hard earned verdict simply because we have the power to substitute our discretion for the trial court. Moreover, unlike *Barnes*, defendant in this case consented to the unredacted report. Indeed, substituting our discretion for the trial court when the City consented to the unredacted report in the first instance is an abuse of our discretion. *Andon v 302-304 Mott St. Assoc.* (94 NY2d 740 [2000]), also cited by Justice Friedman, is consistent with this position inasmuch as it involved a pre-trial order rather than an alleged trial error.

Thus, even if, as my colleagues argue, the conclusion should have been admitted not for its truth, but to show the "effect it had on the mind of the detective" (citing to *Rivera v City of New York*, 200 AD2d 379 [1st Dept 1994], *supra*), the court properly precluded it given that, without a medical examiner subject to cross-examination, the statement's potential for prejudice far outweighed its probative value (*People v Smith*, 22 NY3d 462, 467 [2013]; *cf. Matter of State of New York v Floyd Y.*, 22 NY3d 95, 98 [2013] ["The Due Process Clause protects against the admission of unreliable hearsay evidence, where such hearsay is more prejudicial than probative, regardless of whether it serves as the basis for an expert's properly proffered opinion testimony"]; *People v Morris*, 21 NY3d 588 [2013]). In any event, as the trial court noted, it would have been "questionable" whether an expert could have testified "that the result of death was parental neglect" (*see Welz v Commercial Travelers Mut. Acc. Assn. of Am.*, 266 App Div at 668 [conclusory and hearsay statements in autopsy reports regarding the cause and manner of death, such as that death resulted from "accident," constitute inadmissible opinions that are within the province of the jury to determine]; *see also People v Eberle*, 265 AD2d 881, 882 [2d Dept 1999] [expert's statement that the victim died from "homicidal" suffocation "improperly states a conclusion regarding defendant's intent"]; *Schelberger v Eastern Sav. Bank*, 93 AD2d at 198).

In my opinion, we should modify the judgment solely to the extent of directing a new trial as to damages, unless plaintiff stipulates to decrease the awards to $250,000 and $250,000, respectively. Significantly, plaintiff concedes that the aggregate award of $2 million deviates materially from what would be reasonable compensation in this case and proposed an award of $750,000.